### TOM BARNES v. THE STATE.

No. 1469. Decided April 20, 1898.

**1.  Assault With Intent to Murder—Aggravated Assault—Charge.**

On a trial for assault with intent to murder, where the evidence establishes either an assault to murder or self-defense, the court is not required to charge upon aggravated assault.

**2.  Same—Threats—Charge as to.**

As a general rule, in all cases of assault upon the person, except assault to rape, communicated threats can serve but two purposes: First, to solve the probability as to who began the violence; second, to give character to or intensify an act of the adversary. Where the case is one in which the adversary uses a deadly weapon in a deadly manner, threats can serve no purpose whatever save and except as tending to shed light upon who began the difficulty; in such a case the court is not required to submit a specific charge on threats.

**3.  Same—Presumption from Use of Weapon—Charge.**

On a trial for assault to murder, where it was made to appear that the prosecutor shot at the defendant before the defendant had fired or made any demonstrations at firing upon him, it was not injurious error for the court to omit or refuse to charge the jury that where a deadly weapon is used the presumption obtains that the party using it intended to kill.

APPEAL from the District Court of Falls. Tried below before Hon. SAM R. SCOTT.

Appeal from a conviction for assault with intent to murder; penalty, three years imprisonment in the penitentiary.

The prosecuting witness, J. B. Landrum, testified: "On the 23d of November, 1897, Spink Gaines and I went to the field of the defendant. I went there for the purpose of having a settlement with him about the rent of some land and an account he was due me. When we got to the field where the defendant was we rode up to the cotton pile where he was, and I told him that I had come over for a settlement, and he said all right,

and I began calling over the account, and he agreed to each item until I got to the small item for blacksmithing. The defendant denied owing this, for the reason as he claimed that I had not paid for the same. I told him I had, and he said I had not. I then told him that I heard he had told the officer who came there a few days before to levy on his corn that I was a liar, and that he did not owe me $10. He then said, 'Yes, you are a damn liar,' and fired at me. Some time during the week before this trouble I had sued out a distress warrant and caused same to be levied on defendant's corn. On Monday before this difficulty I went to the house of the defendant to see him two or three times, but he was not at home. When Gaines and myself rode down in defendant's field, the defendant, his wife, and boy were picking cotton; they were a short distance from the cotton pile and when they saw us coming they all went to the cotton pile. I had a pistol on this occasion which was loaded all around. We rode to where the defendant was in ordinary saddle gait. I rode up a little ahead of Gaines."

S. W. Gaines, for the State, testified substantially as did Landrum, and among other things testified: "While in defendant's field Landrum said, 'Yes, and you told Lish Daffan the other day that I was a damn liar, and that you did not owe me anything;' and defendant replied, 'Yes, you are a God d—d liar,' and then pulled his pistol and began to shoot at Landrum. Landrum ran his hand down in his coat pocket, and while he was doing this the defendant fired the first shot, and when he had got his pistol out the defendant fired the second shot. They began to get their pistols about the same time, but when defendant said that Landrum was a damn liar he began to reach for his pistol, and then Landrum went after his. When the shooting commenced we were all right together. I was noticing the hands of Landrum a while before the shooting, but can not say where they were."

Ellen Barnes, for defendant, testified: "I am the wife of defendant, and am acquainted with J. B. Landrum. On Monday, the day before the shooting, he came to our house and asked where the defendant was. I told him that he was not at home. He told me to tell him when he came back to prepare himself, for he was going to settle with him and fix himself to sleep a long sleep. When my husband returned that night I told him that Mr. Landrum had been there and what he said. I did not see Mr. Landrum again until next morning about 11 o'clock, when Mr. Landrum and Mr. Gaines came into our field where my husband, myself, and little boy were picking cotton. There was a road there, but they came down the field. My husband as he came went up to the cotton pile, and as they rode up Mr. Landrum said, 'Tom, I have come to settle with you,' and began firing on him with a pistol, and Mr. Gaines said, 'Shoot! Shoot him!' and he began firing. After Mr. Landrum had fired two shots at my husband, then my husband began to fire at Landrum, and shot at him two or three times with his pistol. They came riding in a hurry down in the field where the difficulty occurred in our field. I told my husband the night before that Mr. Landrum said he was going to kill him."

Erastus Barnes testified for defendant: "I am the son of defendant. Mr. Landrum came to our house on the morning before the shooting and asked where the defendant was. I told him he was not at home. He said to tell him when he came that he had come to settle with him, and by G——d to get ready; G——d d——n him, he was going to kill him. This was in the morning. Mr. Landrum returned again in the afternoon and asked again for the defendant, but the defendant had not returned, and he said the same thing over to me, and said for me to tell him that he had come to settle with him, and that for him to get ready; that he was going to kill him. Monday morning Mr. Landrum left me in the field and went over to the house where my mother was. On the next morning after this we were in the field near the cotton pile. We saw Mr. Landrum and Mr. Gaines coming up, and when they rode up Mr. Landrum said, 'G——d damn you, get ready,' and went to firing upon the defendant, and made two shots at defendant; then the defendant began shooting at them. I was about eight feet from defendant, and could see it all. My father, the defendant, carried the pistol down there that morning, as I had told him Mr. Landrum was going down there to kill him. I told defendant what Landrum had said Monday night when he came home."

Defendant in his own behalf testified: "On Saturday before the shooting occurred on Tuesday I saw Mr. Landrum in Marlin. A short while before he had filed suit against me, and a distress warrant had been issued and levied upon some corn raised upon the place I had rented from him. When I met him in Marlin before the shooting he said, 'Why in the hell didn't you let me have the corn?' I replied that I did not object to letting him have it, but told him there was in the crib some corn that was raised on my place, and I told the officer that the corn was so mixed, and he said he could not take it. He replied that he was coming over Monday and was going to have me or the corn, and if I did not pay him he would kill me. Monday morning I went to Chilton on business, and when I got home that night my wife and boy Rastus told me that Mr. Landrum had been there that day two or three different times, and told them to tell me that he would be back to settle with me; that he was going to kill me, and for me to prepare myself to sleep a long sleep. On Tuesday I took my gun down in the field to protect myself in the event he made an attack upon me. About 11 o'clock I looked around and saw Mr. Landrum and Mr. Gaines coming towards us across the field, and I told my wife and boy about it, and we went to the cotton pile. We all got there about the same time. My pistol and gun were in the cotton pile. Mr. Landrum spoke and said, 'By G——d, I have come to kill you; get ready,' and began shooting at me. I got my pistol out of the cotton pile after Mr. Landrum began shooting at me. Mr. Gaines said, 'Shoot him! Shoot him!' and began firing, and then there was a continued firing until the trouble was over and they trotted off."

Lloyd Barnes, Sr., for defendant, testified: "On Monday before the shooting I saw Mr. Landrum. He was hunting for the defendant. He came to the defendant's field where I was at work; he rode up and asked

abruptly where the defendant was, and looked red in the face. I told him
defendant had gone to Chilton."

*Rice & Bartlett,* for appellant.—The court erred in refusing to give
defendant's special charge on the subject of manslaughter and aggra-
vated assault.

The court erred in omitting to charge on the law of aggravated assault
and battery, and refusing to give the special charge presenting said issue,
as shown by bill of exception. Mackey v. State, 13 Texas Crim. App.,
360; Willson's Crim. Stats., art. 715; Howard v. State, 23 Texas Crim.
App., 265.

The court erred in refusing to give defendant's special charge on self-
defense, accompanied with threats against defendant's life, as shown by
bill of exception.

The court erred in omitting to charge the jury on the law of self-
defense applicable to threats against defendant's life which was appli-
cable to and raised by the issues in said cause.

It clearly appearing from the evidence in this case that the prosecuting
witness had threatened the life of the defendant immediately preceding
the alleged offense, which threats had been communicated to the defend-
ant, and the evidence being conflicting as to who was the aggressor at the
time of the difficulty and who fired the first shot, it was the imperative
duty of the court to charge the jury upon this phase of the case, to wit,
the law of self-defense as applicable to threats against defendant's life,
and a failure so to do is reversible error, more especially where a special
instruction was prepared and asked by defendant to this effect. Hobach
v. State, 43 Texas, 259; Howard v. State, 23 Texas Crim. App., 271;
Willson's Crim. Stats., art. 713; Neyland v. State, 13 Texas Crim. App.,
537; Wadlington v. State, 19 Texas Crim. App., 266.

*W. W. Walling* and *Mann Trice,* Assistant Attorney-General, for the
State.

DAVIDSON, JUDGE.—Appellant was convicted of an assault with in-
tent to murder, and his punishment assessed at confinement in the peni-
tentiary for a term of three years; hence this appeal.

Two assignments of error are urged which require notice: First, the
court should have given a charge on aggravated assault; and second, the
court should have instructed on threats, in connection with the charge on
self-defense.

With reference to the first contention, we would simply observe that
we do not believe that there is any testimony in the record which required
an instruction on aggravated assault. It was either an assault with in-
tent to murder or a case of self-defense.

The charge given on self-defense was in the following language: "On
the law of self-defense you are further instructed that if, from the acts
of J. B. Landrum (if any), or from his words used at the time or prior

thereto (if any), coupled with his acts (if any), there was created in the mind of the defendant a reasonable apprehension that he (defendant) was in danger of losing his life or of suffering serious bodily harm at the hands of said J. B. Landrum, then the defendant had the right to defend himself from such danger as it appeared to him at the time, viewed from his standpoint," etc. The theory of the State, supported by its evidence, was that the prosecutor, in company with one Gaines, went to the field where appellant, his wife and little son, were picking cotton, for the purpose of settling an account which appellant owed him. Appellant disputed an item in the account, and prosecutor remarked "that he understood that he (appellant) had told an officer who came there a few days before to levy on his corn that he (prosecutor) was a liar; that he did not owe me but two dollars. Appellant then said, 'Yes, you are a damn liar,' and pulled his pistol, and began to fire at me. He pulled his pistol, and fired at me, before I made any move to get my pistol, and began shooting at me. I afterwards got out my pistol, and shot at him several times." This was substantially the testimony of both the prosecutor and Gaines as to how the difficulty occurred. Appellant, his wife and son, were all witnesses as to what occurred, and they supported the following theory of the case: "That prosecutor, Landrum, and Gaines came to the field that morning. Prosecutor accosted defendant, and said, 'Tom, I have come to settle with you,' and began firing on me with a pistol; and Mr. Gaines said, 'Shoot, shoot him!' and he began firing. After Mr. Landrum had fired two shots, appellant pulled his pistol, and shot at the prosecutor, and also at Gaines." He then reached in a pile of cotton, and got a shotgun, and both parties left the scene of action, and he fired one shot with his gun at the prosecutor. The appellant also proposed to prove by three witnesses, to wit, his wife, son, and brother, threats made the day before to take his (appellant's) life, and which were communicated to appellant. They state substantially that the prosecutor came to appellant's house on the day before the difficulty, inquired for appellant, and was informed that he was not at home. He told them to tell appellant, when he came back, to prepare himself, for he (prosecutor) was going to settle with him, and fix himself to sleep a long sleep. Appellant also testified that he carried his gun and his pistol to the field the next day to protect himself, in anticipation of an attack by the prosecutor on account of the threats made; that he left the gun and pistol in the pile of cotton, and, when he saw the prosecutor and Gaines coming into the cotton field, he went to the pile of cotton, to be convenient to his gun and pistol; and that he did not pick up his pistol until he was shot at by the prosecutor.

Now, on the case as stated by appellant, he contends that in conjunction with the charge on self-defense, or by a distinct and separate charge, the court should have instructed the jury on threats made by the prosecutor to take his life. It may be stated in general terms that the charge of the court included threats, inasmuch as the court instructed the jury that, in judging of the acts of prosecutor, they were to consider in that connection his words used at the time, or prior thereto, and that the ex-

pression "prior thereto" could have no other allusion than to the previous threats which had been proven. But concede that this charge did not embrace the question of threats,—that is, that the charge in that respect was not emphatic; then, was this such a case as demanded of the court a specific charge on threats? We are of opinion that it is not. Where in a case of murder, or an assault with intent to murder, or in any character of an assault and battery, except an assault with intent to rape, etc., the defendant relies upon threats communicated, the threats can serve but two purposes: First, to solve the probability as to who began the violence; second, to give character to or intensify an act of the adversary. To illustrate: A and B are quarreling or engaged in a wordy altercation. B places his hand to his hip. A shoots or shoots at or strikes him. In the absence of threats, the act of A would not have that significance as if, under the same state of facts, B had made threats which had been communicated to A. Take the case in hand: There was a dispute between the prosecutor, Landrum, and appellant, as to the amount appellant owed the prosecutor. The prosecutor places his hand behind him, or to his hip; and appellant draws a pistol, and shoots at him. Threats communicated would have an important bearing in such case. But suppose that the prosecutor, instead of merely placing his hand to his hip or behind, draws a pistol, and fires at appellant; threats would have no bearing on the case, because appellant would be perfectly justified in shooting independent of threats. Now, there is no act of the prosecutor, under the appellant's theory, which can be viewed in the light of threats, so as to give significance thereto. If appellant's theory be true, he did not need the threats to acquit him. The act of the prosecutor was such as to require no explanation. The prosecutor shot at him without any provocation whatever; and, if the jury did not believe this there was no theory of the case presented by the evidence in which threats could have figured at all. Threats, as before stated, are used for the purpose of giving character and significance to doubtful cases; but, where the case is one in which the adversary uses a deadly weapon in a deadly manner, threats can serve no purpose whatever, save and except as tending to shed light upon who began the difficulty. If the jury failed to believe the theory of the defense, then they believed that of the State, which was that, without any provocation whatever, appellant made a deadly assault upon the prosecutor. If the jury believed the defendant's testimony, a verdict of not guilty should have been rendered, whether or not threats had been made.

It is contended by appellant that the court should have instructed the jury that, where a deadly weapon was used, the presumption obtains that the party using it intended to kill. This is a correct proposition of law; but was there injury to the appellant in failing to submit this proposition? Evidently there was not; for, if the prosecutor did in fact shoot at appellant under the circumstances described in his theory of the case, no jury with any degree of intelligence could have had any doubt as to his intention, it being evident that it was for the purpose of killing appellant. So, we see no injurious error in refusing to submit this principle

of law.. The appellant's theory of the case may be true. The jury, however, have decided adversely to him, and adopted the theory of the State. Under such circumstances, we can not interfere. We have found no reversible error, and the judgment is affirmed.

*Affirmed.*

[NOTE.—Appellant's motion for a rehearing was overruled without a written opinion.—Reporter.]