J. N. Gunn v. The State.

No. 6459. Decided February 22, 1922.

Rehearing denied June 29, 1923.

</div>

**1.—Murder—Jury and Jury Law—Challenges.**

Where the defendant complained of the court's refusal to grant him an additional peremptory challenge in order that he might exercise the same on the last juror to be selected, and it did not appear that the refusal of the trial court to grant such request was erroneous and was calculated to injure the rights of the defendant, there is no reversible error.

**2.—Same—Self-Defense—Standpoint of Defendant—Change of Court.**

Where, upon trial of murder, the jury were told to view the matter from the standpoint of defendant, and if so viewed it appeared that he was being attacked by either of said parties, and if the jury believed the danger from such attack was real or apparent and that this caused the defendant to commit the homicide that he must be acquitted, the same was sufficient, and the requested charges were rendered unnecessary.

**3.—Same—Self-Defense—Actual and Apparent Danger—Charge of Court.**

This court does not think the trial court's charge open to the objection that it limits the defendant's right of self-defense to the existence of actual danger, as the jury were told that defendant might defend against apparent danger, and the reasonable appearance of danger.

**4.—Same—Presumption—Deadly Weapon—Charge of Court.**

Where defendant complained that the court did not charge the presumption arising from the use of a deadly weapon as set forth in Article 1106, Vernon's P. C., held, that from the analysis of the facts it is the conclusion of this court that Article 1106 should not have been given in the court's charge, as this question cannot be determined in any individual case from the sole viewpoint of the inherent character of the weapon claimed to be in the hands of the deceased. Following McCutcheon v. State, 49 Texas Crim. Rep., 607, and other cases.

**5.—Same—Case Stated—Drawing Pistol—Intent to Inflict Death.**

Where, upon trial of murder, the fact was shown that the deceased step-son drew a pistol which was not fired while he was backing through two rooms and across the porch, this court cannot assume as a matter of law that the design of said deceased was to kill, and the mere having in his hand the pistol does not justify the inference that it was his design to inflict death, and there was therefore no reversible error in not giving in the charge the presumption arising under Article 1106, supra. Morrow, Presiding Judge, dissenting.

**6.—Same—Charge of Court—Deadly Weapon—Self-Defense.**

This court's conclusion is, that the facts failed to demonstrate that the deceased step-son was making an attack on defendant with a weapon which as a matter of law was calculated to produce death at the time defendant killed his wife, and deceased, his step-son, and that the law applicable to his defense as supported by the facts was fully given.

**7.—Same—Evidence—Political Affiliation—Harmless Error.**

The inquiry of witnesses for defendant relative to political affiliations of such witnesses with defendant, or that other persons whose interest in his behalf appears were also members of the same political party or candidates of said party for office, would not seem susceptible of harmful effect, and there is no reversible error.

**8.—Same—Threats—Charge of Court.**

Where the rights of defendant to act upon the theory that a threatened attack had begun were fully guarded by the court's charge, and that same was applicable when some or all of the threats were made to the accused direct, as when some or all of these were shown to have been merely reported to him, there is no reversible error.

**9.—Same—Provocation—Manslaughter—Charge of Court.**

This court does not think the charge of the court open to the objection that it is too restrictive in telling the jury what they may consider in de-

termining the sufficiency of the provocation to produce passion which would reduce the killing to manslaughter, and there is no reversible error.

### 10.—Same—Evidence—Position and Surroundings of the Body of Deceased.

Upon trial of murder there was no error to allow the State to show the position and surrounding of the body of the deceased, step-son of defendant, when found after the homicide, as the entire circumstance was so clearly related in point of time and continuity as to make the homicide but one transaction.

### 11.—Same—Sufficiency of the Evidence.

Where, upon trial of murder, the evidence was sufficient to support the conviction, there was no reversible error.

### 12.—Same—Rehearing—Statutes Construed—Article 1106 P. C.

While there are some cases in which an application of Article 1106 P. C. may be demanded it is the judgment of this court that in the instant case it is not one of them. The court in this case gave a charge much more favorable to defendant, and which laid upon him a much less burden than would have resulted had the court given a charge applying Article 1106, and it would be a violation of the mandate 'laid upon this court by Article 743 C. C. P. to reverse and remand this case.    Morrow, Presiding Judge, dissenting.

### 13.—Same—Statutes Construed—Article 1106, P. C.—Presumption.

Article 1106, P. C., makes it necessary that three issues of fact be affirmatively found by the jury to exist, before any presumption of law based thereon could arise, towit, first, that deceased had a weapon; second, that such weapon in the manner of its use was calculated to cause death; third, that with such weapon deceased was making an attack upon defendant reasonably indicating an intention on his part to kill, and this article was, therefore, not only inapplicable but if properly given would have caused vigorous protest from defendant. Distinguishing Kendall v. State, 8 Texas Crim. App., 569.

### 14.—Same—Statutes Construed—Charge of Court—Self-Defense—Presumption of Law.

Upon defendant's testimony as to the appearances of danger as they seemed to him from his viewpoint at the time, arose the application of the charge given by the trial court under which the jury were authorized to return a verdict of acquittal.. Upon exactly the same testimony the jury would be compelled to rely for any finding of the truth of the fact upon which could arise the presumption of law contained in Article 1106, supra..

### 15.—Same—Second Application for Rehearing—Threats.

This court holds that appellant is in error in his objection to paragraph 18 of the court's charge to the effect that it limits the jury's consideration to threats which had been communicated, and that it is calculated to cause their to not regard the threats claimed to have been made directly to the appellant by his step-son.

### 16.—Same—Inaccuracies—Words and Phrases—Charge of Court.

Other errors complained of in the charge amount to mere inaccuracies in the use of words, none of which seem to this court to be so variant from what should have been said as to give rise to any possibility of misunderstanding or injury; nor was the charge on manslaughter defective, and the motion for rehearing must be denied.

Appeal from the District Court of Bell. Tried below before the Honorable M. B. Blair.

Appeal from a conviction of murder; penalty, ninety-nine years imprisonment in the penitentiary.

The opinion states the case.

*Evetts & White* and *W. W. Hair* for appellant.—On question of challenge of Juror Swope, Connell v. State, 75 S. W. Rep., 512.

On question of threats, Swain v. State, 86 S. W. Rep., 335; Huddleston v. State, 112 id., 64; Lundy v. State, 127 id., 1034; Hightower v. State, 119 id., 691.

On question of adequate cause, Cotton v. State, 217 S. W. Rep., 158; Mason v. State, 211 id., 593; Rogers v. State, 212 id., 166.

On question of failure to submit Article 1106 P. C., Ward v. State, 18 S. W. Rep., 793, and cases cited in opinion.

*R. G. Storey,* Assistant Attorney General, for the State. On question of real and apparent danger, Simmons v. State, 55 Texas Crim. Rep., 448.

On question of Article 1106 P. C., Barnes v. State, 39 Texas Crim. Rep., 189; Stanley v. State, 44 S. W. Rep., 519.

LATTIMORE, JUDGE.—Appellant was convicted in the District Court of Bell County of murder, and his punishment fixed at ninety-nine years in the penitentiary.

The facts in this case constitute a tragic history. Appellant, the father of several children, married deceased, who was the mother of six children, and there were born to them five more. The children of each prior marriage seemed to have grown up and left the common home, except that some of the younger sons of deceased would occasionally return and cause much feeling in the family. The killing took place at the home of appellant and the deceased. No one was present at the time save the husband, his wife and the youngest son of the wife by her former marriage. This young man, whose name was Hobart Keaton, was also killed by appellant at the same time and apparently in the same transaction.

The theory of the defense was that if appellant did shoot and kill his wife, the shot was intended for Keaton, and that said shot was fired in self-defense against an unlawful attack by Keaton upon him. Treating the various objections in the order in which they appeared on the trial, we observe a number of bills of exception taken to events occurring in the formation of the jury. In our opinion none of said bills show any arbitrary and unauthorized refusal to sustain any challenge for cause to any particular juror, and the only question

raised by any of said bills of exception calling for discussion on our part, is that complaining of the court's refusal to grant to appellant an additional peremptory challenge in order that he might exercise same upon the juror Swope. Eleven jurors had already been obtained. Appellant had exhausted the peremptory challenges allowed him by statute. He requested the privilege of exercising such challenge upon the juror Swope, which was denied. This bill of exceptions is very lengthy and sets out in extenso, the matters transpiring in the selection of each of the jurors down to and including those relating immediately to the selection of Mr. Swope.

The apparent purpose is to inform us of the reasons calling for the exercise of the prior challenges allowed by statute as peremptory. We think nothing in the *voir dire* examination of juror Swope shows him to be unfair or prejudiced, or in any way disqualified to give to appellant that fair and impartial trial guaranteed by the Constitution and laws. Unless we so believed, those things complained of in this and appellant's other bills of exception relating to the formation of the jury, would be of no moment. It must be shown in some way that in declining to grant him this additonal challenge, a objectionable juror was forced upon appellant, else nothing would be shown to us upon which we could base a conclusion of any injury. The matter is compained of in appellant's motion for new trial. To avail him upon such hearing or on appeal to this court, it must not only be made to appear that the refusal of the trial court to grant such request was erroneous, but also that it was such material error as was calculated to injure the rights of appellant. Art. 837, Vernon's C. C. P., sub-division 2; Leeper, et al. v. State, 29 Texas Crim. App. 72.

Appellant urges what he thinks to be error in paragraph 8 of the court's charge, same being raised by bills of exceptions Nos. 7 and 8. Said paragraph is as follows:

"Now, if you believe from the evidence, beyond a reasonable doubt, that the defendant, J. N. Gunn, in the County of Bell and State of Texas, on or about the time alleged in the indictment, with a deadly weapon or instrument reasonably calculated and likely to produce death by the mode and manner of its use, and not in defense of himself against an unlawful attack, real or apparent, reasonably producing a rational fear or expectation of death or serious bodily injury and not under circumstances reducing same to manslaughter as herein defined, with intent to kill, did unlawfully and with malice aforethought shoot and thereby kill the said Sarah Gunn as charged in the indictment, you will find him guilty of murder, as charged, and assess his punishment at death or by confinement in the penitentiary for life, or for any term of years not less than five."

It is insisted that this is too restrictive, in that it fails to tell the jury that the reasonable fear or expectation of death must be determined alone from the standpoint of the accused; and that it limits his right of self-defense to an attack by Mrs. Gunn alone, it being his contention that Hobart Keaton was making the main attack upon him, and that his right of self-defense should have been stated to exist against danger, real or apparent, from an attack by Keaton, or both Keaton and Mrs. Gunn.   The rule is uniform that the whole charge must be looked to in determining the correctness of any given portion thereof.   Paragraphs 15 and 16 of said charge are as follows:

"Now, if you believe from the evidence beyond a reasonable doubt, that the defendant, J. N. Gunn, killed the said Sarah Gunn by shooting her with a pistol, but if you believe from the evidence, or have a reasonable doubt thereof that when the said Sarah Gunn was so shot, Hobart Keaton was making or was about to make an unlawful attack upon the defendant, which, viewed from his standpoint, and from the manner and character of it, caused him to have a reasonable expectation or fear of death or serious bodily injury, real or apparent, and that acting under such reasonable expectation, or fear, the defendant shot at the said Hobart Keaton and while so shooting accidentally killed Sarah Gunn without intent to kill the said Sarah Gunn, you will acquit the defendant.

Or; if you believe from the evidence beyond a reasonable doubt that the defendant, J. N. Gunn, killed Sarah Gunn by shooting her with a pistol, but if you believe from the evidence or have a reasonable doubt thereof that when the said Sarah Gunn was so killed, she was making or about to make an unlawful attack upon the defendant, which, viewed from his standpoint and from the manner and character of it, caused him, the defendant, to have a reasonable expectation or fear of death or serious bodily injury, real or apparent, and that acting under such reasonable expectation or fear, the defendant shot and killed the said Sarah Gunn, you will acquit the defendant."

An examination of these paragraphs discloses that both of the objections of appellant to paragraph 8 are here obviated.   The jury are told in each paragraph to view the matter from the standpoint of the appellant, and if so viewed it appeared that he was being attacked by either of said parties, and if the jury believed the danger from such attack was real or apparent, and that this caused him to commit the homicide, that he must be acquitted.

Appellant asked the court to give the following special instruction:

"Gentlemen of the Jury:   You are charged that if from the evidence you find that J. N. Gunn was the husband of Sarah Gunn and was in possession of the house and premises where the homicide occurred and if you further find from the evidence that Hobart Keaton

was over 21 years of age at the time of the homicide, then you are instructed that the defendant had the right to request Hobart Keaton to leave his house and premises and if Hobart Keaton refused to leave defendant's home and premises after such request, if same was made by defendant, then the defendant would have the right under the law to use such force as was reasonably necessary to eject him therefrom.''

The refusal of this is made the subject of a bill of exceptions. In the main charge we find the following:

"You are charged that if the defendant forbade Hobart Keaton from entering his, the defendant's home or premises, or forbade the said Hobart Keaton from remaining on the same or ordered him to leave the same, then the defendant would have the right to use such force as would be necessary to put the said Hobart Keaton off the said premises.''

There was no question but that it was shown without dispute that the premises where the killing occurred belonged to appellant, and also that Keaton was over twenty-one years of age, and in our opinion the giving of said special charge was rendered unnecessary in view of the last quoted part of the main charge.

We find ourselves unable to assent to appellant's contention that the law of self-defense as applicable to the facts, was not given to the jury. In addition to paragraph 15 and 16, supra, the court charged the jury in paragraphs 18 and 19 of the charge as follows:

"So, in this case, if you find from the evidence that the deceased, Sarah Gunn, or Hobart Keaton, had made threats against the life of the defendant, or to do serious bodily injury, and that the same came to the ears of the defendant, or he was informed thereof; and that he believed the said threats, if any were made, and if you find from the evidence, or have a reasonable doubt thereof, that at the time of the shooting of Sarah Gunn by the defendant, if he did shoot her, she or Hobart Keaton made any gesture or act or both, indicating to the defendant that she and Hobart Keaton or either of them were then and there in the act of making an attack upon the defendant, or putting into execution any threats that might have been so made, which from the manner and character of it and the defendant's knowledge of the character and disposition of the said Sarah Gunn or Hobart Keaton, caused him to have a reasonable expectation or fear of death or serious bodily injury to him at the hands of Sarah Gunn and Hobart Keaton or either of them, viewed from the defendant's standpoint at the time, then the defendant had a right to act on appearance of danger, and if under such circumstances he shot at Hobart Keaton and that he accidently and without intent to kill Sarah Gunn, did kill her by the shot fired at Hobart Keaton under such circumstances, then such killing of Sarah Gunn would be

justified, and you should acquit the defendant and say by your verdict, 'not guilty.'

Or, if in this case you find from the evidence that the deceased, Sarah Gunn, had made threats against the life of the defendant, or to do him serious bodily injury, and that the same came to the ears of the defendant or he was informed thereof, and that he believed said threats, if any were made, and if you find from the evidence or have a reasonable doubt thereof that at the time of the shooting of Sarah Gunn by the defendant, if he did shoot her, the said Sarah Gunn made any gesture or act or both indicating to the defendant that she was then and there in the act of making an attack upon the defendant or putting into execution any threats that she might have made, which from the manner and character of it, and defendant's knowledge of the character and disposition of said Sarah Gunn, caused him to have a reasonable expectation or fear of death or serious bodily injury to him at the hands of Sarah Gunn, viewed from the standpoint of the defendant at the time, then the defendant had a right to act upon such appearance of danger and if under such circumstances he shot and killed Sarah Gunn, then such killing of Sarah Gunn would be justified and you should acquit the defendant and say by your verdict, 'not guilty.' "

Nor do we think the charge open to the objection that it limits appellant's right of self-defense to the existence of actual danger. We have set out paragraphs 15 and 16 in which the court in terms told the jury that he might defend against apparent danger, and it will appear from paragraphs 18 and 19 last quoted that the jury were told that he might defend against the reasonable appearance of danger.

By his bill of exceptions No. 3 appellant complains that the court did not charge the presumption arising from the use of a deadly weapon as set forth in Article 1106, Vernon's P. C. Exception was taken to the main charge for failing to set forth said presumption. The contention that this should have been given in the charge is based on appellant's testimony. He swore that just pior to the homicide his wife and Hobart Keaton were standing at a wood-pile, and that he told Hobart he wanted him to leave the premises, and the latter said he had come for some money owed him by the appellant and one Wooley and was not going until he got it; that when he came back presently from the toilet in the yard to his kitchen, Hobart was standing there and after some conversation Hobart pulled a pistol and threw it down on him, and that he pulled out his pistol and shot at Hobart. He said that Hobart began to back and backed through the kitchen and dining-room and across the back porch, appellant following him, and that as Hobart was in the act of backing through the outside door of the porch appellant fired at him, and

when he did so he saw his wife fall, and that Hobart continued to back, appellant following him, and that in this relative position they went some two hundred feet or yards, Hobart going forward part of the time and backward part of the time, and that Hobart picked up a stick and started toward appellant, and that he shot and killed him. Appellant said he did not observe Hobart's pistol after he got past the wood-pile. In one place in his cross-examination appellant used the following language: "He backed out through the dining room and then on the screened porch, and when we got out on the porch he was still backing and he still had that pistol in his hand *and it wouldn't work.*" Art. 1106, Vernon's P. C., is as follows:

"When the homicide takes place to prevent murder, maiming, disfiguring or castration, if the weapons or means used by the party attempting or committing such murder, maiming, disfiguring or castration are such as would have been calculated to produce that result, it is to be presumed that the person so using them designed to inflict the injury."

Our analysis of the facts above stated does not lead us to conclude that Article 1106 should have been given in charge. To warrant the assumption as a matter of law that the design of deceased was to kill, the facts must show the weapon used by him to be one calculated to produce that result. This question cannot be determined in any individual case from the sole view-point of the inherent character of the weapon claimed to be in the hands of the deceased. This court has often said that certain weapons used in cases then before the court, were not deadly *per se.* Branch's Ann. P. C., pp. 934-935. These include an axe, a knife, a chair, a loaded walking-cane, a fence pole, a rock, an iron pipe, a stick of cord wood, and firearms when used other than as firearms. Let us go further. One who draws a weapon on another may be convicted of some grade of assault. If such weapon be shown to be a deadly weapon and it appear that the intent of the accused was to injure but not to kill or maim, he might be convicted of aggravated assault under the 8th subdivision of Art. 1022, Vernon's P. C. Though the weapon be one with which death might be inflicted, yet if the intent of the accused be only to alarm, his guilt would be but simple assault under the 3rd subdivision of Art. 1013, Vernon's P. C. Jackson v. State, 90 Texas Crim. Rep., 369, 235 S. W. Rep. 882. In McCutcheon v. State, 49 Texas Crim. Rep. 607, the accused pointed a gun at prosecutor threatening to shoot. The facts showing only an intent to alarm, we held the case one of simple assault. In Ray v. State, 21 S. W. Rep. 540, the accused had a Winchester rifle and demanded a retraction from prosecutor, and not being satisfied with the speed with which the retraction was made, he threw a shell into his rifle. He was held guilty of simple assault. In Hall v. State, 105 S. W. Rep. 816, we

held that the use of a loaded Winchester rifle was but a simple assault when the purpose of such use was to alarm. In Sheffield v. State, 62 Texas Crim. Rep. 556, the accused presented a shot gun at prosecutor, but did not fire same. We reversed an aggravated assault conviction, holding guilt to be but of simple assault. The lamented Judge Davidson said in the opinion:

"As used by appellant, the gun was not a deadly weapon; it was not fired, nor was it used to strike with; no injury was inflicted. In fact, all that was done by the accused was to present the gun in a threatening manner under the circumstances already detailed. Under this character of evidence, and under our statute and decisions, we are of opinion this woud not be more than a simple assault from the State's standpoint."

This language is applicable in the instant case. Taking the situation as most strongly stated by appellant and it appears that deceased drew a pistol and threw it down on him. The pistol was not fired, nor is there evidence to justify the conclusion of any effort, on the part of deceased to fire same. If the weapon was snapped, it is not disclosed; if the trigger was pulled by deceased, that fact is not stated. We quote more fully from appellant's statement of what occurred when he came into the kitchen of his house immediately before the shooting began, as follows:

"And, he said, 'By God he come after that money and he pulled his pistol out, this pistol is the one you show me. We were in the kitchen at the start, and I was facing him and he was facing me and he got out his pistol first and threw it down on me. I don't know whether it would shoot or not. He did not run, but he backed. He wasn't the running kind, but he backed. I reckon his gun wouldn't shoot. I shot at him, but I don't know where the bullet went. I haven't been back in the house since. I don't know whether I shot at his head and shot a little high or not. He didn't run even after I had shot but he backed. I couldn't tell you how fast he backed. I don't know how many times I shot, he kept backing and looking at me and he kept backing through the kitchen and I followed him. I don't know whether I shot any more or not at him. I don't know how many times I shot and I don't know why I shot and why I didn't shoot again. I shot as fast as I could get my gun to work and he backed out through the dining room and then on the screened porch and when we got out on the porch he was still backing and he still had that pistol in his hand and it wouldn't work. He is an expert with a pistol, but he might have got excited. I don't think he was the kind that generally got scared though but he backed all the way out through the kitchen and through the dining room and across the porch and backed out there and opened the screen door and never turned his back to me even then and just as he went out the screen door I

shot at him. I don't know whether I shot more than twice or not. I don't know how many times I shot. The first thing I saw after I had shot at him he went through the screen door my wife was falling backward.''

True, in one place appellant spoke of deceased as "trying to shoot me," but nowhere did he disclose any facts justifying this statement further than that deceased pointed the pistol at him. The trial court, as set out above, rightly gave the jury the law of self-defense against an attack on the part of Hobart Keaton, or of deceased, or both, as well as of a threatened attack by either or both, and this gave to appellant every opportunity for acquittal which is supported by the facts in evidence. From the fact of the drawing of a pistol by deceased, which was not fired while its possessor was backing through two rooms and across the porch, for this court to assume as a matter of law that the design of deceased was to kill, would be wholly unwarranted and seemingly in direct contravention of the holdings in the cases above mentioned. Said authorities seem to demonstrate that from the mere having in his hand a pistol or a gun, the design to inflict death cannot be inferred as a matter of law.

Our conclusion is that the facts fail to demonstrate that deceased was making an attack on appellant with a weapon which as a matter of law was calculated to produce death at the time appellant shot and killed his wife, and that the law applicable to his defense as supported by the facts, was fully given.

We are unable to see just how the trial court could have fairly submitted the law applicable to the issues of fact arising in this case, without submitting all the law relating to the killing of Hobart Keaton in the event he had received the bullet which killed Mrs. Gunn. Appellant swore that he did not intend to kill his wife, and that he shot at Keaton when he saw his wife fall. His whole defense was that he was acting in self-defense against Keaton. His entire conduct, according to his own statement from the beginning of the fatal difficulty in the kitchen until young Keaton fell dead in the field, was the result of his attitude toward and difficulty with Keaton and that of Keaton with him. We see no error in the charge of the court submitting the law of guilt vel non of appellant herein, predicated on the kind and degree of offense which would have existed had Keaton been killed by the shot that took the life of his mother.

The injury of witnesses for appellant relative to political affiliation of such witnesses with appellant, or that other persons whose interest in his behalf appears were also members of the same political party or candidates of said party for office, would not seem susceptible of harmful effect but rather to fall within that rule allowing legitimate exploration of those matters indicating the friendship or leaning of witnesses and those associated with them, toward any party

or issue involved. We find nothing in the cases cited under this contention of appellant, holding a contrary view.

We believe that the rights of the appellant to act upon the theory that a threatened attack had begun, were fully guarded by the charge on that issue as above set out, and that same was as applicable when some or all of the threats were made to the accused direct as when some or all of them were shown to have been merely reported to him. If he heard them, or if he heard of them, and believed what he heard, he would have the same right and no greater to act in self-defense in either instance. We have examined the authorities cited by appellant and find in none of them any distinction between the right of the accused when the threat is made to him, and such right when the threat has been reported to him.

We do not think the charge open to the objection that it is too restrictive in telling the jury what they may consider in determining the sufficiency of the provocation to produce passion which would reduce the killing to manslaughter. While it is true that the court mentioned the past conduct of both Hobart Keaton and Mrs. Gunn in referring to such matters, we find in the same paragraph of the charge the jury were told to consider in that connection all the facts and circumstances in the case. We find nothing in comparing the charge given in this case with those in the authorities cited which would lead us to conclude that before us to be erroneous. We do not think any error appears in refusing any of the special charges in this regard.

The State was allowed to show the position and surroundings of the body of Hobart Keaton when found after the homicide. Objection to this testimony appears in various bills of exception. The State's contention, and indeed the testimony of appellant himself, was that there was a continuous transaction without let or stop from the inception to the end of the tragic affair. Appellant testified that from the time he went into his kitchen and the pistols were drawn, that he pursued Hobart Keaton without any apparent change in the attitude of the parties until Keaton was shot and killed, and that the death of his wife resulted from a shot fired at Keaton during their continued movement. The State's theory seems to be that appellant killed his wife and then pursued and slew the witness to such killing, and that the transactions were so closely related from every standpoint as to become *res gestae* of each other. We believe under any theory of the evidence that the entire circumstance was so closely related in point of time and continuity of action as to make it but one transaction, and that all evidence was admissible to show how or in what manner each successive step of said transaction did in fact take place. The beginning and ending of the unfortunate affair were but a few moments apart. Appellant swore that he acted throughout with but

a single purpose,—to save his own life; and the State's claim was that he did in fact act throughout with but a single purpose, but that it was murder.

There are other matters presented in various bills of exception which have been examined by us and in none of which we find anything to lead us to conclude that this case should be reversed. An extended narration of the facts would serve no useful purpose. The unfortunate history of the marital troubles of appellant and his wife, and the growing feeling of irritation between them leading to their separation; the matters connected with the settlement of the divorce case brought by the wife, and the various difficulties between the parties, would seem to shed no light upon the real issues involved in the decision of this case. There was evidence before the court of ill-feeling on the part of appellant toward his wife, and of statements which might be taken as threats on his part against her. A narration of these matters would not clarify any point discussed by us and we omit same.

Finding no reversible error in the record, the judgment of the trial court will be affirmed.

*Affirmed.*

ON REHEARING.

May 23, 1923.

LATTIMORE, Judge.—A strong motion for rehearing urging error in the refusal of the trial court to charge the law of Article 1106, P. C., and divergent views of the court upon the questions raised, coupled with extended effort to arrive at a correct solution of the issues, have delayed the final decision herein. Our views reflect our best endeavor to decide aright under present laws.

Article 1106 P. C. is as follows: ''Presumption from the use of weapon by deceased.—When the homicide takes place to prevent murder, maiming, disfiguring or castration, if the weapons or means used by the party attempting or committing such murder, maiming, disfiguring or castration are such as would have been calculated to produce that result, it is to be presumed that the person so using them designed to inflict the injury.''

There are cases in which an application of this article may be demanded. Our judgment is that the instant case is not one of them. If we interpret the facts correctly and grasp the propositions of law submitted, the court in this case gave to appellant a charge much more favorable to him, and which laid upon him a much less burden than would have resulted had the court given a charge applying Article 1106, supra. If we be correct in this statement, it would

be a violation of the mandate laid upon us by Article 743 of our Code of Criminal Procedure to reverse this case because of a failure to charge the law of Art. 1106. Article 743, supra, plainly forbids a reversal by this court for a disregard of any of the nine preceding articles of the statutes regarding charges, unless it appear from the record that the alleged error was calculated to *injure the rights* of the defendant, or to affect the fairness and impartiality of his trial. At the risk of repeating, we say that if the charge given was more favorable to appellant and laid a less burden on him under the instant facts, than would have been the case had Article 1106 been charged, we would disregard Article 743 if we reversed this judgment, for such reversal would be for an omission which could not have injured the rights of the accused or prevented his having had a fair trial.

Article 1106 makes it necessary that three issues of fact be affirmatively found by the jury to exist before any presumption of law based thereon could arise, viz: first, that deceased had a weapon; second that such weapon in the manner of its use was calculated to cause death; third, that with such weapon deceased was making an attack upon the accused reasonably indicating an intention on his part to kill. Is this a correct analysis? Kendall v. State, 8 Texas Crim. App. 569, is the leading case. There was no dispute in that case over the fact that deceased had a loaded pistol, that he had made a threat to kill and cocked his pistol, and was peering around the door facing of the room in which was his intended victim, nor that he was holding said loaded and cocked pistol aimed into said room when he was shot by the accused. As far as we know this was the first opinion by this court holding necessary an application of Art. 1106 in the charge. The facts stated seem to call for such charge. The opinion is interesting and worthy of study to get the view point of the great lawyer who wrote it and the great court which handed it down. We quote certain parts of it as illuminating our position that under the facts of the instant case the law of Art. 1106 was not only inapplicable but if properly given would have caused vigorous protest from appellant. Judge Clark said:

"The law separates unlawful violence to the person or unlawful attacks upon the person into two distinct classes, and the right of resistance, to the extent of taking life, must be exercised under essentially different conditions according to the nature and severity of the attack. If it reasonably appears by the acts of the assailant, or by his words coupled with his acts, that it is his purpose or intent to murder, ravish, rob, maim, disfigure, or castrate the assaulted party, then the latter, or some other person in his or her behalf, may slay the aggressor while he is in the act of committing the offense, or after some act is done by him showing evidently an

95 T. C.—19

intent to commit such offense. If the weapons or means used by the party attempting or committing the offense are such as would be calculated to produce that result, it is an imperative presumption of law, not of fact, that the person so using them designed to inflict the injury (Penal Code, Art. 571); the language of the statute is that 'it is to be presumed that the person so using them designed to inflict the injury.' Not that the jury may presume that fact, or are authorized to exercise their intelligent discretion in determining whether the person slain, in view of all the evidence before them, really intended to ·perpetrate the injury; but if the weapon and the manner of its use are such as would have been calculated to produce the result, and the jury determine this affirmatively as a question of fact, pertaining rightfully to their province, then the law steps forward with its presumption and closes the door to further inquiry.''

We further quote:

''The law makes different provisions for the exercise of the right of self-defense or the protection of another, according to the gravity, actual or apparent, of the attack; and the character of the attack must usually be determined by the judge in the first instance, before he delivers his charge to the jury. If the attack of the person slain was manifestly with intent to murder or maim,—that is, made with weapons or other means calculated to produce either of those results,—then there is no occasion to instruct a jury as to the law which obtains in case the attack was of a milder character, because such law is not applicable to the case, and can subserve no purpose other than to confuse the jury. On the other hand, if the attack clearly comes within the meaning of 'any other unlawful and violent attack' than with intent to murder, or main, or seriously injure, then the law governing the graver attacks should be altogether discarded·as inapplicable. It can seldom happen in any case that such a determination by the judge can be attended with serious embarrassment, because it is only required to contemplate the weapons or means used by the assailant in the first instance, and if they are such as would have been calculated to produce death, or mayhem, then the law fixes the character of the assault. Penal Code, Art. 571. But if, upon the trial of any case, the peculiar state of the evidence renders it necessary, in the opinion of the judge, to submit to the jury the law governing the right of resistance to either character of attack, then great caution must be exercised in framing instructions, and the jury must be impressed with the distinctions which obtain in each case, in order that they may not apply to the one the law applicable to the other.''

And again:

"The provisions of this article were directly applicable to certain phases of the evidence, and of paramount importance to the rights of the defendant. If the jury believed from the evidence that, at the time the fatal shot was fired by the defendant, the deceased, Brown, was making a violent attack upon Brooks, under circumstances which reasonably indicated an intention upon his part to murder or maim Brooks, and the weapon used by Brown, and the manner of its use, were such as were calculated to produce either of those results, then the law presumed that Brown designed to murder or to maim Brooks, and the jury should have been so informed in the most explicit terms."

In the instant case appellant was on trial for killing his wife. He claimed he was shooting at his step-son. Without attempting to further state the facts, we will use the term deceased herein referring to the step-son, who was also killed a little after appellant's wife was shot.

If the quotations above given announce correct law, the trial court in the instant case, following them in an attempt to apply the law of Article 1106, would have told the jury that if they believed from the evidence before them *at the time of this trial*, that when the fatal shot was fired by appellant the deceased Keaton had a pistol, and was making a violent attack upon appellant under circumstances which reasonably indicated an intention on his part to kill appellant, and that said pistol and the manner of its use were such as were reasonably calculated to produce such result, then the law presumed that deceased designed to murder appellant and the latter would have the right in such case to kill deceased.

What the court in the instant trial did in fact tell the jury was that if from appellant's standpoint at the time of the killing, viewed in he light of all the circumstances as they then appeared to him, the jury believed that it reasonably appeared to him that his life was in danger real or apparent, or that there was such danger, real or apparent, of serious bodily injury from an attack of deceased, appellant would have the right to slay his assailant and would be guilty of no offense; and further that if he had been informed that deceased had threatened to kill him or do serious bodily injury to him, and that at the time of the shooting, viewed from appellant's standpoint, it reasonably appeared to him that deceased had made any gesture or done any act, or both, which indicated to him that deceased was making an attack on him or attempting to execute the threat theretofore made, and this caused him to have a reasonable expectation or fear of death or serious bodily injury at the hands of deceased, then appellant had the right to act on such appearances, and if he thus shot and killed deceased under such circumstances he would not be guilty.

In the instant case it was not admitted that deceased had a pistol, or that he made any attack, or that he was trying to kill appellant or had made any demonstration of any kind. These were sharply contested issues. Upon appellant's testimony practically alone rested the proposition that deceased even had a pistol. That such pistol if had by the deceased, was in the manner of its use calculated to cause death, was an issue made out by appellant's testimony alone and as easily solved against as in favor of the proposition. So also of the proposition that with such weapon deceased was making an attack reasonably indicating an intention on his part to kill appellant.

When appellant saw deceased and his mother, appellant's wife, at the woodpile a short time before the homicide, according to his testimony he ordered deceased to leave the premises and received the reply that deceased had come for money due him and he was not going until he got it. Appellant then went to the toilet in the yard. Coming presently into the kitchen he said that deceased was in there and when appellant said to deceased that he had told him to go away, deceased again said: "By G—d he came for that money and he wasn't going until he got it." That he then pulled out a pistol and threw it down on appellant. Appellant testified that he then drew his own pistol and began shooting at deceased. The latter backed through the kitchen, through the dining room, across the back porch and to the outer door, holding a pistol in his hand all the time. When he got to the outer screen door appellant again fired at him, and he said he saw his wife fall. Deceased then backed on out of the door, past the woodpile, going across the yard, under a fence, and down some two hundred yards from the house into a field, appellant following him and telling him to leave and deceased replying that he did not have to. Appellant testified at this point deceased picked up a stick and started at him and he shot deceased, and then without going back to where his wife fell he went on over to a neighbor's house. The only other living eyewitness to the tragedy, who lived in a near by tenant house, testified that she heard a shot and ran to her door and saw deceased falling apparently forward and saw appellant running toward him, and after he reached deceased saw him shoot two or three times and then leave. Witness put on her bonnet and ran over there and deceased was dead. She saw no stick in the hand of deceased or upon his body. Other witnesses testified that there were no trees or timber around the point where deceased fell, and that the stick found later across his body was similar to the kind of wood of which the woodpile was composed. These witnesses found the body of Mrs. Gunn, the wife of appellant, lying out in the yard, an axe handle being grasped by her right hand. As testified by the coroner and other witnesses

there were powder burns on the head of Mrs. Gunn and on her left hand. Both Mrs. Gunn and deceased were shot in the left side of the head between the temple and the ear. Many persons searched the yard and ground between the house and the point where the body of deceased was found in the field for weapons but found none. The next morning after the killing the sheriff of the county accompanied by twenty-five or thirty men, who walked abreast and as the sheriff stated "About as close as men could walk abreast," went over the ground between the house and where the body of deceased was found, seaching for weapons but without avail. About a week after the killing appellant's brother and three other men went out and searched over the same ground and found a pistol upon their first waking over it. This group of gentlemen went at the instance of appellant's brother to make this search. The State's contention was that the axe in Mrs. Gunn's hand, the stick on the body of deceased, and the pistol found by the four men a week after the homicide, were but evidences of fabricated testimony, and the deceased had and used no pistol on said occasion. These were questions for the jury.

We have set forth the testimony above so as to make as clear as we can the proposition that the Kendall case on its facts and the law applicable, and the instant case, are as wide apart as the poles, and that in so far as it announces rules based on its facts, the Kendall case supports our contention.

We go a step further and state that a charge authorizing acquittal upon appearances of danger as viewed from the standpoint of the accused at the time, is more favorable to the defense herein than a charge based on facts which are contested in evidence, and must be found to be true by the jury when viewed by them in the light of all the testimony adduced on the trial, which latter is the necessary view point before the presumption of law contained in Article 1106, supra, could arise; at least it seems to us beyond controversy when the facts upon which the said latter presumption depends, as in this case, are based wholly upon the testimony of the accused strongly combatted by the other evidence on the trial, that a charge authorizing acquittal upon such appearances of danger to him, as seen by him at the time under the circumstances as they appeared to him, is much more favorable to the defense than a charge presenting a presumption of law dependent upon facts which must be found true by the jury from hearing of the entire testimony.

When the Kendall case was written the accused could not testify nor apprise the jury of how the actions and conduct of deceased appeared to him. Now it is different. When the Kendall case was handed down Article 743, supra, was not in the statutes. Now it is there and we think its mandates are imperative. We are unable

to agree that anything in the Kendall case supports appellant's right to a reversal for failure to give in the charge the law of Article 1106.

Upon appellant's testimony as to the appearances of danger as they seemed to him from his view-point at the time, arose the application of the charge given by the court under which the jury were authorized, if they believed his testimony, to return a verdict of of acquittal. Upon exactly the same testimony the jury would be compelled to rely for any finding of the truth of the facts upon which could arise the presumption of law contained in Article 1106.

We do not believe any case can be found in the books where the testimony of the accused alone is relied upon to establish both issues, and in which the court fully and fairly submitted the law of the right of the accused to act in self-defense based on danger, actual or apparent, as viewed from his standpoint at the time, in which this court has ever held that it was reversible error to decline to give Article 1106, both issues being dependent upon exactly the same testimony.

Further discussing the matter, attention is called to the fact that the Kendall case, supra, was decided in 1880 and at that time the statutes of this State required the reversal of cases when errors in the charge were excepted to, without regard to the injurious effect of such errors. Nace v. State, 9 Texas Crim. App. 110; Myers v. State, 9 Texas Crim. App. 157. No cases were decided by this court upon facts appearing in the opinions in which charges were held defective for not submitting Art. 1106, after the decision in the Kendall case, supra, till we come to Jones v. State, 17 Texas Crim. App. 602. In that case three witnesses testified that deceased was following the accused with an axe at the time the latter shot, two of them testifying to assaults upon accused with the axe. This court said that the law of Art. 1106 should have been given, and we do not deem this in any way contrary to our views as herein expressed. In Pierce v. State, 21 Texas Crim. App. 540, the next case discussing the law of said article, three witnesses also testified that the injured party was attacking the accused with a knife and had made repeated blows at him before the accused drew his pistol and shot. We find nothing in this case not in consonance with our conclusions. In Cochran v. State, 28 Texas Crim. App. 422, the next case discussing said article, it appears that deceased, after threatening to kill the accused, was advancing on him with a billiard cue raised in his hand, the big end drawn back, when the accused shot. We find nothing in these facts, which were held to call for the submission of the law of Article 1106, which are contrary to our views. We next have the Ward case, 30 Texas Crim. App. 689, from whose facts it appears without dispute that deceased had a pistol and was in the act of drawing same, accompanying this action

by a threat of his immediate purpose to use the pistol. Judge Hurt says in the opinion, referring to the article, which is now 1106, as follows:

"We understand the statute to mean, that when there is evidence showing with reasonable probability that the adversary of the accused was in the act of murder or attempting to commit murder, and a deadly weapon was used by him, then the law presumes that it was the purpose of the party using the deadly weapon to kill and murder; and the court should submit an hypothetical case to the jury, in substance, that if the jury shall believe from the evidence that the deceased was making an assault on the accused, and that he was using a deadly weapon, then the law presumes, and the jury should presume, that deceased designed to kill and murder defendant."

It further appears in the opinion that the State was basing its objection to the giving of said charge on the proposition that deceased was *not using* the pistol at the time, but the fallacy of this contention is demonstrated in the opinion which properly held it a case wherein said article should have been given in charge. We do not disagree in the least with this conclusion. However, at the time the opinion in the Ward case, supra, was handed down present Article 743 of our Code of Criminal Procedure read as follows:

"Whenever it appears by the record in any criminal action upon appeal of the defendant, that any of the requirements of the eight preceding articles have been disregarded, the judgment shall be reversed; provided the error be excepted to at the time of the trial."

See Art. 723 C. C. P., Revised Statutes 1895. Said article was amended in 1897 so as to read as follows:

"Section 1. Be it enacted by the Legislature of the State of Texas: That Article 723, as described in the caption of this act, shall read as follows, viz:

Article 723. Whenever it appears by the record in any criminal action, upon appeal of the defendant, that any of the requirements of the eight preceding articles have been disregarded, the judgment shall not be reversed unless the error appearing from the record was calculated to injure the rights of the defendant, which error shall be excepted to at the time of the trial, or on a motion for a new trial."

The next case discussing the proposition before us, after the passage of the act above referred to, was Stanley v. State, 44 S. W. Rep., 519, the opinion being handed down February, 1898, and Judge Hurt, speaking for the court, uses the following language:

"There was no error in the court failing to charge the jury as to the presumption arising from the use of deadly weapons by the deceased, as is provided by the Penal Code of 1895. The court gave

a charge on self-defense, embracing all that appellant could ask for on this subject. If deceased made any attack on the appellant at all, it was with a pistol; and the court instructed the jury, if deceased made an attack on the defendant, and it reasonably appered to him that his life was in danger, or he was in danger of serious bodily harm, that he would have a right to kill deceased.''

This was followed and approved by Barnes v. State, 45 S. W. Rep. 495, an opinion by Judge Davidson, and in line therewith is Sargent v. State, 35 Texas Crim. Rep. 339, an opinion by Judge Henderson. McMichael v. State, 49 Texas Crim. Rep. 422, is examined. We are not advised by the opinion in that case if Article 743 was considered by the court, or if the charge given was in such condition as that the terms of said article were applicable; but we find that in said opinion which clearly demonstrates its unsoundness. It was a case somewhat similar in facts to the instant case, i. e. the accused had testified that the deceased was trying apparently to kill him with a pistol; the two men being in a dark room lighted only by a few coals in the fireplace and a match which the accused claimed deceased had lit in an effort to locate him, the accused. The learned judge delivering the opinion for this court, does so upon citation of Ward v. State, supra, Hall v. State, 43 Texas Crim. Rep. 484, and Scott v. State, 46 Texas Crim. Rep. 313, and upon the authority of these cases concluded that the trial court had erred in not giving the law of the presumption arising from the use of a deadly weapon as set out in Art. 1106. For three reasons the Mc-Michael case is not a safe authority for the position taken by appellant in the instant case. The authorities cited therein as supporting it, do not support it. The Ward and Scott cases, cited, present facts showing beyond dispute the use of a deadly weapon by the injured party, and in the Hall case, an opinion by Judge Brooks, no facts are given. The reasoning of the judge writing the McMichael opinion, after citing the authorities above mentioned, is as follows:

''In this connection another question arises. Suppose deceased did not have a pistol, but appellant believed he did have one, and believed he saw one in his hand, would he be entitled to said charge predicated on the appearances of danger? He was evidently entitled to a charge on the appearances of danger, and the court gave him such charge; but was he entitled to a charge on the use of a deadly weapon by deceased and the presumption flowing therefrom? We think so. Because of the failure of the court to give said instructions in favor of appellant, the judgment is reversed and the cause remanded.''

It is thus announced that if the accused merely believed that deceased had a pistol, even though in fact he had none, the trial court should have charged the presumption arising from the use of a

deadly weapon. Such reasoning is fallacious and can not be followed to the conclusion announced, and is manifestly wrong and this court would not cite it as authority. Third, it nowhere appears in the opinion in the McMichael case that the court took into consideration the provisions of Article 743 C. C. P., or that the issues in the case were such as to call for its consideration.

We have found no other case on facts at all similar to those before us which support the contention of appellant. We have found no case upon whose well considered authority this court might lean for precedent whose facts are akin to those in the instant record and would be thus deprived of the solace of thinking that at least the doctrine of stare decisis supports the conclusion that the refusal to charge Article 1106 in the instant case demands a reversal. Nor, failing to find support in precedent, can we find comfort in trying to follow our own reasoning about the matter to a logical conclusion that the case should be reversed for such failure.

We would start such reasoning with the plain statutory rule staring us in the face forbidding reversals for a *disregard* of the nine articles affecting charges, unless it appears from the record that same was calculated to injure the rights of the accused or prevent his having a fair and impartial trial. As we understand this, unless from a consideration of the record it appears to the fair mind that by giving the charge refused, a different result might appear reasonably probable from that already attained, then for such refusal the case should not be reversed. We have stated the facts bearing on the proposition under discussion above, but as we near the end of this already long opinion we refer to them again. According to his own testimony appellant was in his kitchen when a pistol was drawn by deceased but not fired. This testimony was considered by the jury. Doubtless they reasoned that appellant dare not claim that the pistol was fired while in the kitchen or dining room, or on the porch across all of which appellant asserted that deceased backed, holding the pistol in his hand,—for such claim on the part of appellant could too easily be refuted by inspection of the premises for bullet holes, etc. Appellant testified that as deceased backed to the outside porch door, he, appellant, fired at him and saw the mother of deceased, the wife of appellant, fall,— she being outside. The testimony was also considered by the jury in connection with other disinterested testimony showing that the woman was shot in the side of the head and that her head and hand were powder burned. They doubtless reasoned that if appellant fired through the door from some place inside the house, his wife, —whose body lay at the woodpile, could not have been powder burned. Appellant said he further pursued deceased past the woodpile, down into a field some hundreds of yards but that he at no time saw a

pistol in the hands of deceased after he passed the woodpile. Scores of disinterested witnesses searched and almost combed the ground from the house to where the body of deceased was found, but saw no pistol. About a week later, at the request of appellant's relatives, a few men went over the ground and found a pistol. This testimony was all considered by the jury and they must have concluded that deceased had no pistol. Why do we say this? For the simple reason that, had they believed that deceased had a pistol, they must have also believed that appellant shot in self-defense against danger from said pistol either real or apparent. They were told to acquit if from appellant's standpoint, viewed in the light of all the circumstances as they appeared to him at the time, he believed himself in danger of life or bodily injury at the hands of deceased. We thus reach the necessary conclusion again that the question of possession of a pistol by deceased was fully considered by the jury under the applicable charges given, and decided in the negative. On the fact of such possession of the pistol and the deadly manner of its use or attempted use, must rest the presumption contained in Article 1106, supra. Unless there be reasonable probability of the existence of the fact, there can be none of the presumption, for the latter is wholly dependent for its existence upon the former.

There has been in some cases a drifting away from the real distinction between the doctrine of self-defense based on danger, real or apparent, as viewed from the standpoint of the defendant, and the doctrine of danger as viewed from the standpoint of the jury at the time of trial in the light of the facts and circumstances as revealed by the evidence in the case. This distinction loomed large in the mind of Judge Clark when he wrote in the Kendall case, supra, and is a real and not an imaginary distinction. One whose defense is based on his own testimony almost entirely, to the effect that it seemed to him that there was danger calling for action on his part, could be seriously hurt by a charge giving prominence to Article 1106 under which the presumption of an intent to kill, maim, etc., could only arise in case the jury from their standpoint, viewed in the light of all the circumstances in the case at the time of trial, should conclude that the injured party had a weapon and was so using it as that it seemed calculated to produce death, maiming, etc. In such case the proof adduced on the trial might show conclusively that the injured party had no weapon, or that he made no attempt to use it. The law of Article 1106, supra, would thus be used to deprive the accused of his right to a charge on apparent danger, and of his right to a charge on danger real or apparent, as it appeared to him at the time of the occurrence. Surely this is plain and leads to the observation that not all the law of self-defense should be given in every case, but only that which is apt and which

gives to the parties their rights under the facts in that particular case.

In the case made by the facts in the record before us, if the court had omitted to charge on the law of self-defense as applicable to the right of appellant to defend against danger, real or apparent, as it appeared to him at the time of the homicide,—and had charged that *if*, the jury believed from all the evidence before them that deceased had a pistol and was using it in a manner calculated to inflict murder, maiming, etc., they should then presume that he designed to inflict such injury and in such case they should acquit, —then indeed would there have been serious and just complaint, and we would likely have reversed the case on the ground that the law applicable had not been given. But the law applicable was given, and that which in our opinion was not applicable, was refused.

Our great respect for the legal opinion of learned counsel for appellant and our desire to be right in this decision, has led us to go over this matter many times in the light of its facts and the former opinions of this court, but each review but more firmly fixed our conclusion that the jury were given full opportunity for consideration of the only facts which might serve as the basis for any legal presumption arising under Article 1106, and having been so fully considered under the charges given presenting the law of self-defense upon danger, real or apparent, as viewed from the standpoint of the defendant at the time, the jury have rejected the truth of such contention; and in such case we find ourselves incapable of believing that the giving of the law of Article 1106 could have added to appellant's chance of acquittal. So concluding, and believing further that under Article 743, supra, our duty is plain, the motion for rehearing must be and the same is overruled.

*Overruled.*

ON REHEARING.

May 23, 1923.

MORROW, PRESIDING JUDGE (dissenting).—After much thought and research my associates have determined that it is questionable whether the evidence is such as calls for a charge on the presumption arising from the use of a deadly weapon; that if under the facts such a charge would have been appropriate, its omission in the instant case was not error authorizing a reversal of the judgment. In forming this conclusion, if I properly comprehend their view, they are of the opinion that taking into account the charge that was given and the facts in hand a reversal should not result for the reason that the omission was not calculated to injure the rights of the appellant and did not militate against a fair and im-

partial trial. They are of the opinion that if there be error, it is one which would come under Article 743 of the Code of Crim. Procedure.

If the question was one of first instance, the logic of the majority opinion would be appealing. The statute declaring that where a deadly weapon is used by the deceased in a homicide case, the legal presumption that it was his intent to slay, has long been a part of the criminal law of the State and has often been construed. This court has frequently held that in a case where the facts come within the purview of the statute, it is the duty of the trial court, upon request of the accused, to instruct the jury in proper terms that if the deceased was using a deadly weapon his intent to slay is presumed as a matter of law, and his intent is not a question of fact. Many illustrative cases are collated by Mr. Branch in his Criminal Laws of Texas, Sec. 476. Some of them are discussed and cited in the case of Briscoe v. State, 236 S. W. Rep. 991, 90 Texas Crim. Rep. 650; Lewellen v. State, 236 S. W. Rep. 987, 90 Texas Crim. Rep., 588, and in the dissenting opinion written by Judge Davidson in Alexander's case, 63 Texas Crim. Rep. 139. In some of the cases cited, there are expressions which, in the opinion of the writer, announce a proposition that is not sound. This is notably true in McMichael's case, 49 Texas Crim. Rep. 425, where this language is used:

"In this connection another question arises. Suppose deceased did not have a pistol, but appellant believed he did have one, and believed he saw one in his hand, would he be entitled to said charge predicated on the appearances of danger? He was evidently entitled to a charge on the appearances of danger, and the court gave him such charge; but was he entitled to a charge on the use of a deadly weapon by deceased and the presumption flowing therefrom? We think so."

In my opinion the statute has no application to a case in which the deceased was not using a deadly weapon. The belief of the accused that the deceased was doing so or was about to do so, would be cared for in the ordinary charge on self-defense embodying the law of apparent danger. Conscious of the interpretation which this court has continuously made of the statute in question, (Art. 1106, of the Penal Code), the Legislature has not only refrained from repealing it, but in successive revisions has brought it forward unchanged, thus giving the constructon placed upon it by the court the force of legislative adoption. See Lewis v. State, 58 Texas Crim. Rep. 361, in which the following quotation is taken from Black on interpretation of Laws, page 369:

"When the Legislature revises the statutes of the State, after a particular statute has been judicially construed, without changing

that statute, it is presumed that the Legislature intended that the same construction should continue to be applied to that statute.''

In the opinion written by Judge Ramsey in the Lewis case, supra, there are cited many decisions and text-books supporting the principles stated. In the writer's opinion, the application of this rule of law to Article 1106 of the Penal Code is manifest, and its repeated reenactment without change in its verbiage and after its construction as indicated above, is conclusive against the right of this court to give it a different interpretation.

In the instant case, the appellant used these expressions touching the immediate incidents of the homicide:

''He (deceased) said: 'By God, he didn't have to go anywhere, and grabbed his gun, and when he threw it down on me, I grabbed mine and went to shooting.''

Appellant said further:

''The first thing I saw was my wife falling back with the axe falling back over her head. At that time Hobart had his gun in both hands. I couldn't stop to take care of my wife, he still had his gun trying to shoot, and I kept after him.''

He also used this language:

''I don't know how many times I shot, he kept backing. He backed out through the dining-room and then on the screened porch and when we got out on the porch he was still backing and he still had that pistol in his hand and it wouldn't work. He is an expert with a pistol, but he might have got excited. . . . I don't know whether his pistol wouldn't shoot or not.''

In the opinion of the writer, this testimony brings the statute into application, and following the terms of the law as previously construed, stamped with Legislative sanction, it was imperative that the legal presumption arising from the use of the weapon be given in a charge to the jury upon the request of the accused.

For these reasons the motion for rehearing should be granted, the affirmance set aside, and the judgment of the trial court reversed and the cause remanded.

OPINION ON APPLICATION FOR LEAVE TO FILE SECOND MOTION FOR RE-
HEARING.

June 29, 1923.

LATTIMORE, JUDGE.—Appellant asks leave to file a second motion for rehearing and accompanies same with a review of some of the questions raised in his original motion for rehearing which were not discussed by us in our opinion on said motion. Each of the matters now raised was carefully considered in the original opinion

herein, and we have again gone over them in the light of this request. We think appellant in error in his objection to paragraph 18 of the court's charge, said objection being that it limits the jury's consideration to threats which had been communicated to him by other parties and that it is calculated to cause them to not regard the threats claimed to have been made directly to appellant by Hobart Keaton. We do not think the charge subject to this criticism. An examination of said paragraph makes it appear that the court told the jury that if either Sarah Gunn or Hobart Keaton had made threats against the life of appellant and "that same came to the ears of defendant or he was informed thereof," and we can not follow appellant when he insists that this did not include threats made directly to appellant by his step-son.

Other errors complained of in the charge amount to mere inaccuracies in the use of words, none of which seem to us to be so variant from what should have been said as to give rise to any possibility of misunderstanding or injury. Nor can we agree with appellant that the charge on manslaughter is defective. It does not limit the jury's consideration in determining the adequacy of the cause, to the conduct of either Hobart Keaton or his mother and expressly authorizes the jury to take into consideration, in addition to what occurred at the time of the homicide, "the past conduct of the deceased, Sarah Gunn and Hobart Keaton or either of them toward the defendant, . . . in fact all the facts and circumstances in the case should be considered by the jury. An act standing alone may not be sufficient provocation, but may be ample when one in a series of similar acts, or when it has been preceded by an insolent and aggravating course of conduct, whether similar or not to the act committed at the time of the homicide." So also in applying the law to the facts in the charge on manslaughter, the jury were given the liberty of considering the matter from all the facts and circumstances then known to appellant.

We regret that we can not agree with learned counsel in his contentions in this case. The case has been most vigorously defended and as far as we are able to see, every question pertaining to the rights of the appellant has been raised and presented.

The application for permission to file a second motion for rehearing will be denied.

*Rehearing denied.*